UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No._____–Civ–_____/_____

ISHAVION SINGLETON, as mother and
next friend of K.S., a minor,

    Plaintiff,

vs.

CARNIVAL CORPORATION,

    Defendant.
_____/

# COMPLAINT

Plaintiff, Ishavion Singleton, as mother and next friend of K.S., a minor, sues Defendant, Carnival Corporation, and alleges:

## A. Summary of Case

1. This is a personal-injury/negligence case brought by a cruise-ship passenger against a cruise line after a slip-and-fall accident.

2. Because the injured passenger, "K.S.," is a minor (age 6 in June 2023), this suit is brought on his behalf by his mother and next friend, Ishavion Singleton.[1]

3. In this Complaint, K.S. is referred to by his initials rather than his name because Rule 5.2(a)(3) of the Federal Rules of Civil Procedure requires that minors be referred to by their initials in documents filed with the court.

## B. Basis for Jurisdiction and Venue

4. This case falls within the Court's diversity-of-citizenship jurisdiction because:

    (a) The Plaintiff is a citizen of Louisiana.

---

[1] "A minor . . . who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem." Fed. R. Civ. P. 17(c)(2).

1

  (b)  The Defendant is a citizen of the Republic of Panama and the state of Florida, as it is a corporation incorporated under the laws of Panama, and as its principal place of business is in Florida.

  (c)  The amount in controversy, without interest and costs, exceeds $75,000.

5. Although the saving-to-suitors clause gives the Plaintiff the right to file this case in state court where the Plaintiff would have a constitutional right to a jury trial, and although the Plaintiff wanted to exercise that right and file this case in state court, he has been forced to file this case in federal court instead because the Plaintiff's cruise ticket contains a forum-selection clause that requires actions such as this to be filed in the United States District Court in Miami, Florida.

### C. Rule 9(h)(1) Designation

6. Because this accident occurred on a ship sailing in navigable waters and because the ship was engaged in pleasure cruising–an activity bearing a substantial relationship to traditional maritime activity—the Plaintiff's claim for relief falls within the admiralty or maritime jurisdiction and is governed by the general maritime law. But the claim also falls within the court's subject-matter jurisdiction on diversity-of-citizenship grounds (see paragraph 4, above), so the Plaintiff designates this claim as one brought at law under the court's diversity-of-citizenship jurisdiction. (Although this claim is brought at law rather than in admiralty, it is still governed by the general maritime law.)

### D. Four Counts of Negligence

#### Count 1
#### Direct Liability for Negligent Action/Inaction

7. On or about August 18, 2022, the Plaintiff, K.S., a minor—then age 5—accompanied by his mother, Ishavion Singleton, and other family members, set sail from New Orleans on a four-day, Western-Caribbean cruise on the *Carnival Valor*, a cruise ship owned and operated by the Defendant.

8. One of the attractions on the *Carnival Valor* is the "Twister" waterslide, which the Defendant advertises as hundreds of feet long—it starts on the top deck of the ship and spirals downward through several lower decks.

9. Passengers enter the Twister, sit feet first, then are whisked down the Twister by gravity and a stream of constantly flowing water.

10. Toward the end, the slide flattens out (levels off), which slows the slider down, bringing him or her to a gradual stop to conclude the ride.

11. Unlike some waterslides that end by depositing the slider into a shallow swimming pool, the Twister, after flattening out, comes to an end at a solid barrier that blocks the slider form going any further; most sliders, including K.S., come to a stop before reaching that barrier.

12. Once the slider has come to a stop, he or she must exit the Twister by climbing over the left wall of the slide (the wall on the slider's left), which appears to be about one or two feet high at that point.

13. To prevent congestion at the end of the slide, and to see that sliders exit the Twister in a safe and orderly manner, the bottom end of the Twister is supposed to be manned by at least one crewmember.

14. There are no handrails for a slider to grasp as he or she climbs over the wall and exits the Twister.

15. The Defendant holds the Twister open to children of all ages who are taller than a certain height.

16. On or about the afternoon of August 19, 2022, as the ship cruised in navigable waters, Ishavion Singleton accompanied K.S. to the Twister's entrance and watched as K.S. sat down and began his slide down the Twister.

17. Moments later, when K.S. arrived at the bottom of the slide, no crewmember was present to assist him in exiting the slide, so the five-year-old was left to fend for himself—his mother had not yet made it down to the bottom of the slide.

3

18. When K.S. climbed over the slide's left wall and stepped down onto the surface next to the slide, he slipped and fell, slamming the back of his head on the deck with such force that a substantial laceration opened and began to bleed profusely.

19. K.S. was taken to the ship's medical center where several staples were needed to close the laceration.

20. At the time and place of K.S.'s accident, the Defendant owed K.S. a duty of reasonable care.

21. At that time and place, the Defendant breached its duty of reasonable care by failing to assist K.S. as K.S. exited the Twister waterslide.

22. That breach was committed by the Defendant directly, by virtue of the Defendant's failing to assign a crewmember to watch over the bottom end of the Twister at that time.

23. The Defendant's breach of the duty of care caused K.S. to slip and fall.

24. When K.S. fell, not only did he badly lacerate the exterior of his head, but he also injured his brain—an injury from which he is still suffering almost a year later: in the ten months since this accident, K.S.'s brain injury has caused K.S. to suffer from headaches, behavioral problems, sleep problems, mood problems, learning problems, and other problems. And as of June 2023, K.S. is still being treated for this brain injury and will continue treatment for the foreseeable future.

25. In summary, when K.S. fell, he suffered bodily injury and resulting pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, and educational expenses for remedial tutoring and the like, as K.S. began to perform poorly in school after injuring his brain. The losses are either permanent or continuing and K.S. will suffer these losses in the future.

26. Because K.S. is a minor, this suit is brought on his behalf by his mother and next friend, Ishavion Singleton.

27.     K.S. has performed all conditions precedent to be performed by him, or the conditions have occurred.

Therefore, the Plaintiff demands judgment against the Defendant for more than $75,000 in damages, and costs, and the Plaintiff demands a jury trial.

## Count 2
### Vicarious Liability for Negligent Action/Inaction

28.     On or about August 18, 2022, the Plaintiff, K.S., a minor—then age 5—accompanied by his mother, Ishavion Singleton, and other family members, set sail from New Orleans on a four-day, Western-Caribbean cruise on the *Carnival Valor*, a cruise ship owned and operated by the Defendant.

29.     One of the attractions on the *Carnival Valor* is the "Twister" waterslide, which the Defendant advertises as hundreds of feet long—it starts on the top deck of the ship and spirals downward through several lower decks.

30.     Passengers enter the Twister, sit feet first, then are whisked down the Twister by gravity and a stream of constantly flowing water.

31.     Toward the end, the slide flattens out (levels off), which slows the slider down, bringing him or her to a gradual stop to conclude the ride.

32.     Unlike some waterslides that end by depositing the slider into a shallow swimming pool, the Twister, after flattening out, comes to an end at a solid barrier that blocks the slider form going any further; most sliders, including K.S., come to a stop before reaching the barrier.

33.     Once the slider has come to a stop, he or she must exit the Twister by climbing over the left wall of the slide (the wall on the slider's left), which appears to be about one or two feet high at that point.

34.     There are no handrails for a slider to grasp as he or she climbs over the wall and exits the Twister.

35. To prevent congestion at the end of the slide, and to see that sliders exit the Twister in a safe and orderly manner, the bottom end of the Twister is supposed to be manned by at least one crewmember.

36. The Defendant holds the Twister open to children of all ages who are taller than a certain height.

37. On or about the afternoon of August 19, 2022, as the ship cruised in navigable waters, Ishavion Singleton accompanied K.S. to the Twister's entrance and watched as K.S. sat down and began his slide down the Twister.

38. Moments later, when K.S. arrived at the bottom of the slide, no crewmember was present to assist him in exiting the slide, so the five-year-old was left to fend for himself—his mother had not yet made it down to the bottom of the slide.

39. When K.S. climbed over the slide's left wall and stepped down onto the surface next to the slide, he slipped and fell, slamming the back of his head on the deck with such force that a substantial laceration opened and began to bleed profusely.

40. K.S. was taken to the ship's medical center where several staples were needed to close the laceration.

41. At the time and place of K.S.'s accident, the Defendant owed K.S. a duty of reasonable care.

42. At that time and place, the Defendant vicariously breached its duty of reasonable care when its crewmember failed to assist K.S. as K.S. exited the Twister.

43. When the Defendant's crewmember failed to assist K.S. as K.S. exited the Twister, the crewmember was acting within the course and scope of his or her employment with the Defendant.[2]

44. Because the Defendant's crewmember was acting within the course and scope of his or her employment with the Defendant when he or she failed to assist K.S., the Defendant is

---

[2] "A plaintiff is the master of his or her complaint and may choose to proceed under a theory of direct liability, vicarious liability, or both." *Yusko v. NCL (Bahamas), Ltd.*, 4 F.4th 1164, 1170 (11th Cir. 2021).

vicariously liable for that crewmember's action and inaction under the respondeat-superior doctrine.

45. The Defendant's crewmember's failure to assist K.S. at the end of the Twister constituted a breach of the Defendant's and its crewmember's duty of care. (Onboard ship, the Defendant acts through its crewmembers—who are its employees—so the crewmembers' duty of reasonable care is the same as the Defendant's duty of reasonable care.)

46. That breach of the duty of care caused K.S. to slip and fall.

47. When K.S. fell, not only did he badly lacerate the exterior of his head, but he also injured his brain—an injury from which he is still suffering almost a year later: in the ten months since this accident, K.S.'s brain injury has caused K.S. to suffer from headaches, behavioral problems, sleep problems, mood problems, learning problems, and other problems. And as of June 2023, K.S. is still being treated for this brain injury and will continue treatment for the foreseeable future.

48. In summary, when K.S. fell, he suffered bodily injury and resulting pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, and educational expenses for remedial tutoring and the like, as K.S. began to perform poorly in school after injuring his brain. The losses are either permanent or continuing and K.S. will suffer these losses in the future.

49. Because K.S. is a minor, this suit is brought on his behalf by his mother and next friend, Ishavion Singleton.

50. K.S. has performed all conditions precedent to be performed by him, or the conditions have occurred.

Therefore, the Plaintiff demands judgment against the Defendant for more than $75,000 in damages, and costs, and the Plaintiff demands a jury trial.

## Count 3
## Direct Liability for Negligent Failure to Warn

51. On or about August 18, 2022, the Plaintiff, K.S., a minor—then age 5—accompanied by his mother, Ishavion Singleton, and other family members, set sail from New Orleans on a four-day, Western-Caribbean cruise on the *Carnival Valor*, a cruise ship owned and operated by the Defendant.

52. One of the attractions on the *Carnival Valor* is the "Twister" waterslide, which the Defendant advertises as hundreds of feet long—it starts on the top deck of the ship and spirals downward through several lower decks.

53. Passengers enter the Twister, sit feet first, then are whisked down the Twister by gravity and a stream of constantly flowing water.

54. Toward the end, the slide flattens out (levels off), which slows the slider down, bringing him or her to a gradual stop to conclude the ride.

55. Unlike some waterslides that end by depositing the slider into a shallow swimming pool, the Twister, after flattening out, comes to an end at a solid barrier that blocks the slider form going any further; most sliders, including K.S., come to a stop before reaching that barrier.

56. Once the slider has come to a stop, he or she must exit the Twister by climbing over the left wall of the slide (the wall on the slider's left), which appears to be about one or two feet high at that point.

57. To prevent congestion at the end of the slide, and to see that sliders exit the Twister in a safe and orderly manner, the bottom end of the Twister is supposed to be manned by at least one crewmember.

58. There are no handrails for a slider to grasp as he or she climbs over the wall and exits the Twister.

59. The Defendant holds the Twister open to children of all ages who are taller than a certain height.

60. On or about the afternoon of August 19, 2022, as the ship cruised in navigable waters, Ishavion Singleton accompanied K.S. to the Twister's entrance and watched as K.S. sat down and began his slide down the Twister.

61. Moments later, when K.S. arrived at the bottom of the slide, no crewmember was present to assist him in exiting the slide, so the five-year-old was left to fend for himself—his mother had not yet made it down to the bottom of the slide.

62. When K.S. climbed over the slide's left wall and stepped down onto the surface next to the slide, he slipped and fell, slamming the back of his head on the deck with such force that a substantial laceration opened and began to bleed profusely.

63. K.S. was taken to the ship's medical center where several staples were needed to close the laceration.

64. At the time and place of K.S.'s accident, the Defendant owed K.S. a duty of reasonable care.

65. At that time and place, the Defendant breached its duty of reasonable care by failing to warn K.S. and his mother that no one would be present at the bottom of the waterslide to assist K.S. as he exited the waterslide, for if such a warning had been given, K'S.'s mother would have told K.S. not to start his slide until she'd walked down to the bottom end and was in position to help K.S. at the end of the slide.

66. The Defendant's breach of the duty of care caused K.S.'s mother not to be in position at the bottom end of the Twister to help her son exit the Twister without slipping and falling.

67. This breach of the duty of care caused K.S. to slip and fall.

68. When K.S. fell, not only did he badly lacerate the exterior of his head, but he also injured his brain—an injury from which he is still suffering almost a year later: in the ten months since this accident, K.S.'s brain injury has caused K.S. to suffer from headaches, behavioral problems, sleep problems, mood problems, learning problems, and other problems. And as of June 2023, K.S. is still being treated for this brain injury and will continue treatment for the foreseeable future.

69. In summary, when K.S. fell, he suffered bodily injury and resulting pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and

treatment, and educational expenses for remedial tutoring and the like, as K.S. began to perform poorly in school after injuring his brain. The losses are either permanent or continuing and K.S. will suffer these losses in the future.

70. Because K.S. is a minor, this suit is brought on his behalf by his mother and next friend, Ishavion Singleton.

71. K.S. has performed all conditions precedent to be performed by him, or the conditions have occurred.

Therefore, the Plaintiff demands judgment against the Defendant for more than $75,000 in damages, and costs, and the Plaintiff demands a jury trial.

## Count 4
## Direct Liability for Negligent Failure to Install Handrails/Grab Bars

72. On or about August 18, 2022, the Plaintiff, K.S., a minor—then age 5—accompanied by his mother, Ishavion Singleton, and other family members, set sail from New Orleans on a four-day, Western-Caribbean cruise on the *Carnival Valor*, a cruise ship owned and operated by the Defendant.

73. One of the attractions on the *Carnival Valor* is the "Twister" waterslide, which the Defendant advertises as hundreds of feet long—it starts on the top deck of the ship and spirals downward through several lower decks.

74. Passengers enter the Twister, sit feet first, then are whisked down the Twister by gravity and a stream of constantly flowing water.

75. Toward the end, the slide flattens out (levels off), which slows the slider down, bringing him or her to a gradual stop to conclude the ride.

76. Unlike some waterslides that end by depositing the slider into a shallow swimming pool, the Twister, after flattening out, comes to an end at a solid barrier that blocks the slider form going any further; most sliders, including K.S., come to a stop before reaching that barrier.

77. Once the slider has come to a stop, he or she must exit the Twister by climbing over the left wall of the slide (the wall on the slider's left), which appears to be about one or two feet high at that point.

78. To prevent congestion at the end of the slide, and to see that sliders exit the Twister in a safe and orderly manner, the bottom end of the Twister is supposed to be manned by at least one crewmember.

79. There are no handrails or grab bars for a slider to grasp as he or she climbs over the wall and exits the Twister.

80. The Defendant holds the Twister open to children of all ages who are taller than a certain height.

81. On or about the afternoon of August 19, 2022, as the ship cruised in navigable waters, Ishavion Singleton accompanied K.S. to the Twister's entrance and watched as K.S. sat down and began his slide down the Twister.

82. Moments later, when K.S. arrived at the bottom of the slide, no crewmember was present to assist him in exiting the slide, so the five-year-old was left to fend for himself—his mother had not yet made it down to the bottom of the slide.

83. When K.S. climbed over the slide's left wall and stepped down onto the surface next to the slide, he slipped and fell, slamming the back of his head on the deck with such force that a substantial laceration opened and began to bleed profusely.

84. K.S. was taken to the ship's medical center where several staples were needed to close the laceration.

85. At the time and place of K.S.'s accident, the Defendant owed K.S. a duty of reasonable care.

86. If the duty of reasonable care means anything, it must at a minimum require property owners operating thrill rides like the Twister to spend at least some time inspecting the operation of those rides. And if the Defendant had complied with that duty by simply opening its eyes and spending just a short time observing young children like K.S. struggling as they negotiate their way over and around the slippery, wet surfaces they have to negotiate when they

exit the Twister, the Defendant would have known—in a matter of minutes—that the absence of handrails or grab bars there is a hazard. Therefore, because the Defendant's exercise of reasonable care would have made this hazard plainly obvious to the Defendant, the Defendant is constructively charged with knowledge of this hazard. In other words, the only way the Defendant can deny knowledge of this patently obvious hazard (obvious to the Defendant owner but not so obvious to a five-year-old rider or to the five-year-old's mother who is hurrying down from the start of the Twister on an upper deck) is to deny ever having observed young children negotiating their way off the Twister, but if the Defendant denies taking time to make those observations, the Defendant is admitting to a breach of its duty of care.

87. The Defendant's failure to install handrails or grab bars at the end of the Twister constitutes a breach of the Defendant's duty of reasonable care caused K.S. to slip and fall.

88. When K.S. fell, not only did he badly lacerate the exterior of his head, but he also injured his brain—an injury from which he is still suffering almost a year later: in the ten months since this accident, K.S.'s brain injury has caused K.S. to suffer from headaches, behavioral problems, sleep problems, mood problems, learning problems, and other problems. And as of June 2023, K.S. is still being treated for this brain injury and will continue treatment for the foreseeable future.

89. In summary, when K.S. fell, he suffered bodily injury and resulting pain and suffering, disability, physical impairment, disfigurement, mental anguish, inconvenience, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, and educational expenses for remedial tutoring and the like, as K.S. began to perform poorly in school after injuring his brain. The losses are either permanent or continuing and K.S. will suffer these losses in the future.

90. Because K.S. is a minor, this suit is brought on his behalf by his mother and next friend, Ishavion Singleton.

91. K.S. has performed all conditions precedent to be performed by him, or the conditions have occurred.

Therefore, the Plaintiff demands judgment against the Defendant for more than $75,000 in damages, and costs, and the Plaintiff demands a jury trial.

Dated: June 29, 2023

Respectfully submitted,
David W. Singer (Florida Bar No. 306215)
dsingeresq@aol.com
Peter G. Walsh (Florida Bar No. 970417)
pwalsh@1800askfree.com
David W. Singer & Associates, PA
1011 South Federal Highway
Hollywood, FL  33020
954-920-1571
Attorneys for the Plaintiff, K.S.